[Crim. No. 3288. Second Appellate District, Division One.—June 5, 1940.]

THE PEOPLE, Respondent, v. CARL PUSTAU, Appellant.

John A. Holland for Appellant.

Earl Warren, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Respondent.

WHITE, J.—From a judgment of conviction upon an indictment charging him with the crime of perjury, and from an order denying his motion for a new trial, defendant prosecutes this appeal. The perjury is alleged to have been committed by defendant in the course of his testimony given before the grand jury of Los Angeles County. The indictment reveals that at the time of defendant's appearance before it as a witness, that body was engaged in an inquisition and investigation into charges concerning the alleged asking and receiving of a bribe in violation of section 68 of the Penal Code and also the asserted wilful and corrupt misconduct in office of certain public officers of Los Angeles County.

Summarizing the facts, so far as they appear to be germane to the issues now presented to us, it appears that during the 1937 session of the California state legislature, the then speaker of the assembly introduced certain legislation by which county supervisors, by a four-fifths vote, were empowered to transfer drainage districts within the county to flood control districts, whereupon the latter became liable for all the outstanding bonds and obligations of such drainage districts. The act became effective August 27, 1937. (Stats. 1937, chap. 641, p. 1761.) On August 30, 1937, a proposal for such a conveyance of drainage districts in Los Angeles County failed of passage before the board of supervisors, three members of that body voting for, and two against the same. Later, however, on December 1, 1937, a similar proposal carried by a vote of four of the five supervisors. About

April, 1939, the state senate then in session caused to be published a legislative investigative report, commonly referred to as the "Philbrick Report" (Senate Journal, April 4, 1939, pp. 1086-1150), which purported to contain the result of an investigation into alleged official misconduct in the state. Certain pages of that report were devoted to what was denominated "drainage district legislation" and specifically mentioned a secretary to one of the Los Angeles county supervisors. Upon the publication of such report, the board of supervisors of Los Angeles County, on April 12, 1939, requested the grand jury to investigate the charges therein contained with reference to officials in Los Angeles County. It was in conformity with such request that the grand jury proceeded to inquire into the possible passing of a bribe and also wilful and corrupt misconduct in office by public officials.

The pertinent portions of appellant's testimony before the grand jury were: That he had not discussed the transfer of drainage districts in Los Angeles County with the speaker of the assembly and did not tell one J. P. Dunn, a private investigator, on November 1, 1937, that he, the speaker, and the aforesaid supervisorial secretary, were negotiating for such transfers on behalf of certain railroads; that said Dunn had placed a dictaphone in a certain hotel room during a conference between defendant, the assembly speaker and the supervisor's secretary, for the sole purpose of checking up on appellant and seeing that he stayed honest and not to check up on the other two present; that on November 8, 1937, when appellant and the aforesaid speaker and secretary came together about 1 o'clock in a room in the aforesaid hotel, the speaker was very full of liquor and after he had greeted the supervisor's secretary the former indulged in some loud obscenity and began to holler, "I will do anything Carl" (appellant) "says if he will give me another drink," and by this time the supervisor's secretary left in disgust, and that constituted all that was said and all that occurred in the room at that meeting. Appellant further testified before the grand jury that during such meeting no mention whatsoever was made of drainage districts, and that the assembly speaker said nothing whatever about a railroad company nor mentioned an officer of one of such companies. That during that meeting no mention was made of $2,500 or any other

sum; that the supervisor's secretary did not say, "Well, so am I, Mose" (addressing the assembly speaker) "particular who I shake hands with, but if you have something in the palm of your hand, I am not so particular," nor anything to that effect.  Finally, appellant further testified that shortly after the meeting Mr. Dunn showed appellant what purported to be a transcript of the conversation between appellant, the speaker and the supervisor's secretary in the hotel room, and that such transcript contained no reference to a drainage district or to any $2,500 fee, and that it contained no reference to any discussion of any drainage district matter, but only "a part of a lot of kidding and obscene words of two men that had met, one drunk and the other sober . . . who was trying to get out of a predicament as fast as possible".

At the trial the purported transcript of the conversation that occurred in the hotel room, as taken down by a shorthand reporter by means of a dictaphone, was read to the jury, and the same contained matter directly refuting portions of appellant's testimony before the grand jury, of which the following is illlustrative:

"Supervisor's secretary: Well, anyhow, Mose" (the assembly speaker), "they had this drainage thing all worked out once, but your people were not ready.  It is not time to open it up again—we should wait until next year—

"Assembly speaker: It has got to be within thirty days—anything Carl" (referring to defendant, Carl Pustau) "says is O. K. with me.

"Supervisor's secretary: Does this mean going back to the original deal—if so, it cannot be done.

"Appellant: I don't think that is exactly right—it must be done within thirty days—how can it be worked out, Leo?" (Supervisor's secretary.)

"Assembly speaker: I trust Carl and he can work it out—whatever he says is O. K. with me.

"Supervisor's secretary: Well, I think we can work it out, if Carl is ready we can work it out.

"Appellant: O.K., but Mose, you should understand on county business it is not going to be so easy to do.

" . . .

"Supervisor's secretary: As far as we are concerned, I think it should be next year—your fees are no good after

thirty days—if nothing happens between now and thirty days, Mose, you would have your fees reissued—

"Appellant: What do you think can be done in thirty days, Leo?

"Supervisor's secretary: I will have to check it—the Board will not try to open it up again now—they think we should wait until next year and keep it in the budget—

"Appellant: Do you think a year from now, Leo, would do anybody any good, without some assurances?

"Assembly speaker: I am not going to keep the fee open for another year—I will tell you something—ah nuts—what the hell—

"  . . .

"Supervisor's secretary: Who do you represent, Mose—are you retained by the Santa Fe?

"Assembly speaker: No, I represent the (loud whispers) U. P.—I represent Jeffers—let it go at Omaha—

"  . . .

"Appellant: Mose, shall I tell him the $2,500.00 is ready? Shall I tell him O.K.? He is expecting to hear it, you know—

"Assembly speaker: Yes, absolutely Carl—it's O.K.—

"Appellant: You understand that, Leo?

"Supervisor's secretary: O.K. Carl,—let's shake hands on it, Mose—

"Assembly speaker: I am particular who I shake hands with—

"Supervisor's secretary: Well, so am I, Mose, but if you have something in the palm of your hand I am not so particular."

The foregoing, though but a brief summary of the circumstances surrounding the alleged perjury, furnishes, we feel, a sufficient factual basis for consideration by us of the attack made upon the judgment by appellant.

■ As a first ground of appeal it is urged that the indictment is defective in that it does not allege facts sufficient to show that any crime of perjury had been committed. Because appellant failed to interpose a demurrer or motion at the time he was arraigned for plea upon the indictment, his attack upon the sufficiency of the pleading is limited to lack of jurisdiction in the court or the failure of the pleading to state facts sufficient to constitute a public offense.

(*People* v. *Byron,* 103 Cal. 675, 677 [37 Pac. 754]; *People* v. *Kinsley,* 118 Cal. App. 593, 596 [5 Pac. (2d) 938].) In epitomizing his argument on this point appellant says: ''All of the facts set forth in said indictment were immaterial and redundant to any issue in the case and that at no place in said indictment was it shown that said Carl Pustau knowingly made any statement to said grand jury that was false.'' In the course of his argument appellant resorts to testimony taken at the trial and to matters not testified to at the trial, but which he claims are of public record in Los Angeles County, such as the acquittal of the supervisor's secretary and the dismissal as to the speaker of the assembly of bribery charges contained in an indictment returned against them as the outgrowth of the grand jury inquisition in connection with which appellant gave his testimony—from all of which, argues appellant, it must be assumed that there was no misconduct on the part of county officials or any violation of section 68 of the Penal Code, and therefore appellant's testimony could not constitute material matter. The argument is fallacious. ■ The sufficiency of an indictment must be tested in the light of the averments therein contained. The pleading here in question sets forth the substance of the controversy or matter in respect to which the offense was committed, before whom the oath alleged to be false was taken; that the person before whom it was taken had authority to administer it; coupled with proper allegations of the falsity of the matters on which the perjury is assigned. Where, as here, the indictment sets out that the defendant under oath knowingly gave certain false testimony; that the testimony so given was material, and then sets forth in detail such testimony, and points out wherein it was false and untrue, the indictment is sufficient, because such allegations advise the defendant of the charge against him in such a manner as to enable him to properly prepare a defense thereto. (Pen. Code, sec. 950; *People* v. *Carnicle,* 137 Cal. App. 324, 325 [31 Pac. (2d) 216]; *People* v. *Low Ying,* 20 Cal. App. (2d) 39, 41, 42 [66 Pac. (2d) 211].) ■ The test of materiality is met when it can be said that the testimony could have properly influenced the tribunal before which the case was being heard, upon the issues involved. (*People* v. *Albert,* 91 Cal. App. 774 [267 Pac. 587]; *In re Braynard,* 52 Cal. App. 631 [199 Pac. 576].) The pleading before us meets

that test, as is evidenced from a mere reading of the asserted dictaphone transcript contained therein of the conversation in the hotel between appellant, the assembly speaker and the supervisor's secretary, in conjunction with the averments contained in the indictment as to the nature of the inquisition in which the grand jury was engaged.

██ Appellant's contention that the court erred in admitting into evidence the conversation in the hotel room which was heard over a dictaphone, written down in shorthand and later transcribed, cannot be sustained. The main objection urged to this testimony is that the dictaphone listener and transcriber did not see the persons whose voices he recorded. But there are other ways of identifying voices than by seeing the speaker. (*People* v. *Schultz*, 18 Cal. App. (2d) 485, 488 [64 Pac. (2d) 440].) Further, appellant readily admitted his presence at the conference in question, as did the other two participants therein, and the shorthand reporter testified he was familiar with the voice of appellant. Manifestly no prejudice occurred to appellant by reason of the trial court's ruling in this regard. ██ What we have just said is equally decisive of appellant's objection to the introduction in evidence of a telephone conversation between appellant and the assembly speaker on November 19, 1937, which conversation was transcribed by the witness Handy while listening to it on an extension telephone. This conversation tended to prove that appellant was discussing the drainage district transaction, contrary to his denial thereof in his testimony before the grand jury, and which transaction was then under investigation by the grand jury.

██ Appellant next assigns as error the fact that the court did not rule upon the materiality of the evidence, but left it to the jury to determine as a question of fact the materiality of the alleged perjured testimony. It is true that the function of the jury is to find the facts and apply to them the law as given by the court; and on a trial for perjury it is the duty of the court to instruct the jury as to what facts would show material testimony (*People* v. *Lem You*, 97 Cal. 224, 228 [32 Pac. 11]), but we have no hesitancy in saying as a matter of law that much of the allegedly perjured testimony was material. When, therefore, the trial court left to the jury the determination of the materiality of the facts which they found in connection with the false testimony, the substantial

rights of the defendant were not prejudiced, but as a matter of fact he thereby received more favorable consideration at the hands of the trial court than that to which he was entitled. Of this he cannot be heard to complain, nor is it ground for reversal, for if the jury were led to the erroneous belief that they could decide upon the materiality of the evidence and had decided that it was not material, the defendant would have obtained an acquittal to which he was not entitled.

A reversal is also urged upon the ground, as stated by appellant, ''that the people failed to show any corroboration of any of the allegations in the indictment''. It is elementary that perjury must be proved by the testimony of two witnesses or of one witness and corroborating circumstances. (Code Civ. Proc., sec. 1968; Pen. Code, sec. 1103a.) This, however, simply means that it is necessary to have positive testimony as to the facts that are absolutely incompatible with the innocence of the accused. (*People* v. *Porter,* 104 Cal. 415 [38 Pac. 88] ; 20 Cal. Jur. 1023.) Testimony proving a state of facts contrary to that sworn to by the accused, or absolutely incompatible or physically inconsistent with his evidence, will be sufficient. (*People* v. *Chadwick,* 4 Cal. App. 63 [87 Pac. 384] ; *People* v. *Casanova,* 54 Cal. App. 439 [202 Pac. 45] ; *People* v. *Follette,* 74 Cal. App. 178 [240 Pac. 502].) The rule is thus stated in *People* v. *Casanova, supra*: ''The statute respecting the *quantum* of evidence necessary in perjury cases will be satisfied if there be the testimony of óne witness to facts that are absolutely incompatible with the innocence of the accused, corroborated by circumstances which, of themselves and independently of such directly inculpatory evidence, tend, with a reasonable degree of certitude, to show that the accused is guilty as charged.''

It not being essential that every assignment of perjury charged in an indictment be established, but that one sufficiently proven will sustain a conviction, we shall not here discuss the corroborative evidence on each assignment, but shall set forth a few of these assignments and point out the direct and corroborative evidence establishing the same. Appellant's testimony before the grand jury that he and the speaker of the assembly never discussed the transfer of any drainage districts in Los Angeles County nor was such matter discussed at any time by any persons present in the hotel room

on November 8, 1937, is directly refuted by the witness Handy's notes of the conversation between appellant and those present in the hotel room and corroborated by the supervisor's secretary, who testified at the trial of appellant that the latter told him "the matter of the drainage districts was going to be discussed" at the meeting at the Clark Hotel. This witness further testified that at such last-mentioned conference there was conversation "pertaining to the transfer of the drainage districts" and that his best recollection was that appellant brought the subject up at that time. Appellant testified before the grand jury that he did not, on or about November 1, 1937, tell the witness Mr. Dunn in effect or in substance that in conjunction with the speaker of the assembly and the supervisor's secretary he was negotiating on behalf of several railroads in connection with the transfer of liabilities from drainage districts in Los Angeles County to the flood control district, and that three railroads were interested in securing the transfer of these drainage districts to the flood control district. The witness Dunn testified directly to the contrary. Appellant's testimony before the grand jury that the witness Dunn put the dictaphone equipment in the hotel room for the sole purpose of checking up on appellant was directly contradicted by the witness Dunn, who testified that when he questioned the accuracy of appellant's statements the latter replied that he would prove them and would arrange a meeting with the speaker of the assembly and the supervisor's secretary, and that Dunn might select a place and put sound equipment in the room in order to hear the discussion. Appellant further testified before the grand jury that following the meeting in the hotel room on November 8, 1937, the witness Dunn showed him on that same afternoon what purported to be a transcript of the conversation which had taken place in the room, and that such transcript did not contain any reference to a drainage district or to any $2,500 fee or to any discussion of any kind between appellant and the speaker of the assembly or the supervisor's secretary concerning a drainage district, and that it contained only "a lot of kidding and obscene words". This is positively and directly refuted by the transcript of the conversation at the hotel room taken by the witness Handy and also by the latter's testimony that about two hours after he had taken these notes he, the witness Dunn and appellant were

present in Dunn's office, at which time Handy read the notes to appellant and Dunn, and that at appellant's suggestion an insert was made in the transcript. Also, further corroboration is contained in the testimony given by Mr. Dunn. With reference to appellant's testimony before the grand jury to the effect that he had not discussed with the speaker of the assembly the matter of a transfer of drainage districts to the flood control district and that the assembly speaker never told him what project he was interested in or what his business was with the supervisors of Los Angeles County, it might be noted that upon his own direct examination at the trial appellant admitted that the assembly speaker told him that he had some clients that would give a $2,500 fee in the matter of the flood control transaction in which the county board of supervisors would be interested. Appellant further testified at his trial that he and the witness Dunn had discussed the matter of having both the assembly speaker and the supervisor's secretary meet appellant so that they could continue with the business that the speaker wanted to take up with the supervisor's secretary, and that the former told appellant he wanted to talk over this drainage matter with the supervisor's secretary. The record presents further corroborative evidence which need not here be detailed. The statutory requirements affecting a prosecution for perjury were met by abundant direct or positive evidence and corroborating circumstances absolutely incompatible with the innocence of the accused.

Finally, appellant contends that the trial court erred in refusing to give to the jury five instructions offered by him. The gist of appellant's complaint in this regard is that the refused instructions contained a statement to the effect that criminal intent is a vital element in perjury, that the intention to swear falsely is necessary and that such testimony must not only be false, but must have been given with knowledge that it was false. We say without hesitation from a reading of all instructions given that the jury were clearly, understandingly and unerringly admonished, and must have understood, that they must be convinced beyond a reasonable doubt before they could find the defendant guilty that he knowingly, wilfully and in violation of his oath testified falsely as to the matters material to the grand jury's inquisition. The jury were further advised that such conviction must be

based upon the testimony of two witnesses or one witness and corroborating circumstances; and further, the jury were admonished that before they could convict appellant it was necessary for them to be convinced beyond a reasonable doubt that at the time of giving such testimony he knew the same to be false and gave such testimony wilfully and for the purpose and with the intent of deceiving and misleading the grand jury. From a reading of all the instructions given, we are impressed that the trial judge fully and fairly advised the jury as to the kind, quality and degree of proof necessary before appellant could be convicted of perjury. This is all the law requires. (*People* v. *Kelly,* 70 Cal. App. 519, 524 [234 Pac. 110]; *People* v. *Alston,* 139 Cal. App. 575, 576 [34 Pac. (2d) 759]; *People* v. *Bolton,* 215 Cal. 12, 22 [8 Pac. (2d) 116]; *People* v. *Jordan,* 24 Cal. App. (2d) 39 [74 Pac. (2d) 519]; *People* v. *Curtis,* 36 Cal. App. (2d) 306 [98 Pac. (2d) 228]; *People* v. *Macken,* 32 Cal. App. (2d) 31 [89 Pac. (2d) 173].) A reading of the transcript, including the instructions, impresses us that the learned trial judge painstakingly and zealously guarded the rights of appellant. The latter had a fair and impartial trial—in fact, the trial judge displayed to the defense unusual consideration and patience.

For the foregoing reasons, both the judgment and the order denying the motion for a new trial are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.